The opinion of the Court was delivered by
Dunkin, Ch.,
[who, after stating the facts and quoting, lastly, the provisions of the Act of 1849, above quoted, proceeded as follows :] It seems difficult to misconceive the purpose of the Legislature in this last provision. In all charters of this character it is the great duty of the Legislature to protect the interests of the public. Corporations or individuals, applying for franchises or exclusive privileges, are usually sufficiently awake to their own interests. But while the Legislature should promote enterprises whose object is the public convenience as well as private» emolument, they should adopt every reasonable precaution, that these exclusive privileges should not become instruments of oppression or annoyance. When application was made to the Legislature, in 1848, it was well known that the City Council of Augusta had a toll lrouse on the Georgia side of the bridge, at which they received tolls from all persons, &c., passing over the bridge from the Georgia or South Carolina side. It was expressly provided that no tolls should be collected by the grantees until the Supreme Court of the United States should recognize and establish their rights against the City Council of Augusta. It will not be suggested, that under that Act, strictly provisional, the grantees had any authority to collect toll until the right had been determined by the Supreme Court in their favor. This proviso was repealed in the subsequent Act of 1849. But in lieu of it, the Act declares, not only that the grantees should not col *462 lect toll “ from persons coming from the Georgia end of the bridge,” but that the collecting of toll from persons going from the South Carolina end of the bridge “ should not subject the Rail Road Company, or the community, to the payment of double toll.” It seems superfluous to say that this provision was not intended for the benefit of the grantees. It was to protect the travelling public, and particularly the Rail Road Company, from the annoyance and injury to which they would be subjected by the conflicting claims of the City Council of Augusta, and those who might demand toll under the authority of the Act of 1849. It is objected, that this construction renders the charter valueless. That was for the consideration of those who accepted it. It certainly was not the intention of the Legislature to subject the citizen to the payment of double toll (contrary to their express declaration,) and then leave him to the casualties and expense of litigation in order to ascertain from which party he might be entitled to redress. Happily the Act imposes no burthens on the grantees, and exacts no consideration from them. The utmost that can be said is they have not derived from the munificence of the State the advantages which they hoped and contemplated.
Many other and far more difficult and important subjects have been brought into the discussion, but upon which the Court deems it inexpedient, on this occasion, to express any judgment.
On the second ground of appeal taken by the complainants, the Court is of opinion that they were entitled to the injunction as prayed by the bill, which is ordered accordingly; and the decree of dismissal is reversed.
JohNStoN, EargaN and Wardlaw, CO., and O’Neall, EvaNS, Wardlaw, Frost, Withers and Whither, JJ., concurring.

Decree reversed.

The following case, Yarborough fy Shultz vs. The Bank of Georgia and others, tried before Harper, Ch., at Edgefield, June, 1842, is appended as a note to the above case :
Harper, Ch.
In 1813, the State of South Carolina granted to Henry *463 Shultz and Lewis Cooper, a charter for a bridge over the Savannah, river, extending from this State into the town of Augusta, for the term of twenty-one years; and in the year 1814, the State of Georgia granted a charter for the same bridge for the term of twenty years. In 1816, the said Henry Shultz and John McKinne formed a partnership in the business of banking, under the name and style of the Bridge Company of Augusta. Being then the joint owners, they entered in the partnership book of the Company the bridge, valued at $75,000, and other property, as the partnership stock, with various stipulations which it is not necessary to recapitúlale On the 21st April, 1818, the complainant, Shultz, sold and transferred his interest in the partnership to Barna McKinne; conveying the bridge and other real property. The consideration for this transfer was the sum of $63,000, in which Shultz was indebted to the firm, and which was paid by giving him credit on the books of the firm, and charging the amount to Barna McKinne. The Company became greatly embarrassed, in consequence of the failure of certain mercantile firms, with which John and Barna Mc-Kinne were connected, and they being indebted to the Bank of the State of Georgia, in the sum of $40,000, applied to the Bank for a further advance of $60,000. The evidence is, that in making the application to the Bank for the advance of $50,000, the. object of it is stated to be to relieve the Bridge Company, and enable it to wind up its affairs; but after the loan was effected, only a portion of the sum, perhaps two-fifths, was applied to the use of the Company. Notes were given for the advance of $50,000, signed by John McKinne, and endorsed by Barna McKinne and James Lampkin. To secure the payment of the entire sum of $90,000, a mortgage was executed by John and Barna McKinne, of the date of the 3d of Ma.y, 1819, of eighty negroes, the property of John McKinne; of McKinne’s warehouse square, and of the bridge; conditioned to be void as to the negroes upon the payment of $40,000, and upon the payment of the remaining $50,000, to be void altogether-. In consequence of some mistake in the corporate name of the Bank, another mortgage of the same tenor and effect was executed on the 10th June of the same year. On the 29th of May, 1819, the Bridge Bank stopped payment. Upon being apprised of this, the complainant, Shultz, who had made arrangements for going to Europe, returned and resumed his place in the firm, by some agreement with Barna McKinne, who quitted it, and took no further share in the management of its business. The evidence is, that Shultz advanced $15,000 of his own funds, to pay the deposites in the-Bank. An advertisement was issued signed by John McKinne and Henry Shultz and Barna McKinna, stating the resources of the Bank, in order to prevent the holders of the bridge bills from sacrificing them, with a notice signed by John McKinne and Henry Shultz, advertising for salea number of negroes and the bridge, and'stating that before the making of titles to the latter, the lien which the Bank of the State of Georgia had on it should be removed. By a deed bearing date the *464 first of July. 1820, Barna McKinne re-conveyed, released, and quit claim to Henry Shultz, all his interest in the firm or its property. The mortgage to the Bank is charged by the bill to be void, by virtue of the Act of the State of Georgia, which provides that if any person unable to pay his debts, shall make 11 any assignment or transfer of real or personal property, stock in trade, debts, dues, or demands,” in favor of any particular creditor, whereby other creditors shall be excluded, “ such assignment, transfer, deed, or conveyance, shall be null and void, and considered in law and equity as fraudulent against creditors ; provided, nothing in the Act contained shall prevent any person from bona fide selling any portion of his property.
In 1821. a petition was filed on behalf of the Bank of the State of Georgia, in the Superior Court for Richmond county, Georgia, praying for a foreclosure of the mortgage, and at May Term of that year a rule was issued, directed, according to the practice of that State, to John and Barna McKinne, requiring them to pay the amount of principal and interest due on the mortgage, or to be foreclosed. • This having been served and no defence rriade, at May Term, 1822, the rule was made absolute, and the defendants were declared to be forever foreclosed; the sum of $69,493 was adjudged due to the Bank for their debt, principal and interest, and the sum of dollars for
their costs. It was further ordered and decreed, that the mortgaged property should be sold, and the. surplus, if any, paid to the mortgagors No sale'was made under this decree, as the, sale was enjoined, on a bill filed by Henry Shultz, Christian Breithaupt, and others, against the Bank of .the State of Georgia and others, in the Circuit Court of the United States at Savannah, for the purpose of obtaining a sale under the decree of that Court, so that a full and unencumbered title to the whole .bridge might be made to the purchaser, and praying that the proceeds of the sale might be applied to the payment of the creditors of the Bridge Company, and particularly to the holders of certain judgments, founded on bridge bills. In this case, by consent of parties, an order was made for the sale of the bridge, and Freeman Walker and Christopher Fitzsimons, esquires, were appointed commissioners for the purpose of making the sale, and it was ordered that the parties should execute powers of attorney for that purpose to tbe said commissioners. In pursuance of this order, a power of attorney, signed by Christian Breithaupt and Henry Shultz, was executed on the 19th of January, 1822. The sale was made accordingly on the 28th of November, 1822, and the Bank of the State .of Georgia became the purchaser, at the price of $70,000. For this amount, the Bank issued scrip, which, by the order of the Court, was deposited with its clerk'
The case was afterwards certified to the Supreme Court of the United States, upon a division of opinion between the Judges of the Circuit Court, and at January Term, 1828, was dismissed for want of jurisdiction. The ground of the dismissal was, that the bill contained *465 no allegation, that the parties, plaintiffs and defendants, were citizens of different. States. Upon this, a negotiation for a compromise took place. Some difficulties were experienced in the course of the negotiation, but in consequence of it, and with a view to the compromise, the cause, was, by consent of parties, reinstated on the docket of the Supreme Court, and removed to the Circuit Court. The necessary amendment being made, a final decree was made by consent of all parties,- on the 8th of May, 1830. By that decree, the sale made by the c< mmission-ers in 1822 was ratified and confirmed, and the Bank of the State of Georgia, declared to be “ vested with a full, absolute and perfect title to the said bridge, and its appurtenances, under the said sale, freed, acquitted, released and discharged from all manner of liens, claims or incumbrances, in law or equity, on the part of the said Henry Shultz, John JVIcKinne, Barna McKinne, Christian Briethaupt, or any other person or persons, parties to the said bill of complaint.” It was further decreed, that the scrip issued by the Bank, should be cancelled and delivered up to it, and the bill dismissed as to all other matters contained in it.
This decree was entered .in consequence of the compromise which had already been carried into effect by the parties to the suit. The Bank of the State of Georgia paid to Christopher Fitzsimons and Christian Sriethaupt, holders of judgments, founded o,n bridge bills, and to the complainant Shultz, each, the sum of ten thousand dollars ; in consideration of which payments, they released to-the Bank all their respective rights in the bridge, or the proceeds of its sale, and all debts, dues, actions and demands whatever, in the most, comprehensive terms possible. The release of Shultz, is dated the 15th Sept. 1829.
On the 15thOcrober, 1828, the complainant Shultz, being in custody of the shei iff of Edgefield district, by virtue of a writ of .capias ad satisfaciendum, in order to obtain the benefit of the insolvent oebtor’s Act, assigned his estate ami effects to Thomas Harrison, Treasurer of the Upper Division of the Slate, for the benefit of’ hi- creditors. The assignee declined to accept the trust. On the 2d of May, 1S32, a bill was Sled by John Stoney, John Magrath and others, against the pre- . sent complainant Shultz and others, wnicli was heard by Chancellor Johnston at Edgefield, on the 19th June, 1832, and finally decided by the Court of Appeals, January, 1834. In the course of this proceeding, Ker Boyce and Thomas Harrison were appointed trustees for the creditors of Shultz, in place of Harrison, who declined to accept alone, andón the 8th December, 1S30, they were made parties to t.he bill. The object of the bill, (indeed there were several bibs which were all di-posed of together,) was to obtain' payment of certain demands against Shultz, out of his property, and lots of Shultz, in the town of Hamburg, and from the purchasers of lots sold hv him. By the final judgment of the Court, certain rents were received, and property sold to a considerable amount, ($70,000 as it was alleged ) and it was in evidence, that a portion of those proceeds were applied to the *466 payment of judgments against Shultz, founded on bridge bills. The releases of Fitzsimons, Briethaupt and Shultz, were in evidence in that cause. The complainant, Yarborough, was substituted trustee in the place of Harrison and Boyce, on the application of Shultz in 1840.
By an Act of the Legislature of the State of South Carolina, of the l'8th December, 1830, the charter of the bridge was renewed for a term of 14 years, and granted to the Bank of the State of Georgia, and on the 23d of December, 1833, by an Act of the State cf Georgia, a similar grant was made to the same grantee, for a term of ten years.— On the 4th May, 1838, the Bank of the State of Georgia sold and conveyed the bridge and appurtenances to the defendant Gazaway B. Lamar, of that State, for the consideration of $70,000. On the 21st January, 1840, the said Gazaway B. Lamar, sold and conveyed to the defendants, the City Council of Augusta, for the consideration of $100,-000. Both these defendants deny explicitly any notice of the assignment of Shultz, at the time of their respective purchases. There was no evidence whatever, of notice to the defendant Lamar, at the time of his purchase. Some evidence was offered of notice to the City Council of a claim of Shultz, on the bridge, before the purchase; but there was a difference as to the terms of it, by the evidence. One writness stated, «hat it was a notice of the claim of Shultz himself only, and that upon taking legal advice, they were-assured he could have no claim. Another witness stated notice to be given of claims of his creditors. I do not consider the fact of notice to be established.
The bill charges that the sale made under the judgment of the Federal Court is null and void, the bill having been dismissed for want of jurisdiction; that the mortgage to the Bank of the State of Georgia, being void under the law of Georgia, the bridge still remains partnership property; that creditors of the partnership have an equity to be satisfied out of the partnership property, in preference to creditors of the individual partners; that the debt of the Bank is the individual debt of John and Barna McKinne; that partnership debts having been satisfied by the individual property of the complainant Shultz, he or his assignee and creditors, claiming in his right, have a right to be sub-rogated to the equity of the partnership creditors, whose debts have been so paid. It charges that if the sale be valid, the Bank is accountable to the complainant for the amount of the purchase money and interest. The bill prays that the bridge may be sold, and the proceeds appropriated among the parties according to their respective rights; that the defendants may account for the income of the bridge, during the time that it has been in their possession respectively, and for general relief.
The defendants answer at length to the charges of the bill, and among other matters of defence, the Bank of the State of Georgia relies by way of pleading, on the want of jurisdiction in this Court; that being a corporation of another State, and having no property within the limits of this. *467 It migilt sufficiently dispose of all tbe matters of the present bill, to say that they are concluded by tbe decree of the Federal Court. All the claims now made, were made by that bill. It claimed that the proceeds of the bridge should be applied to the payment of partnership creditors, and that the defendant should account for income ; and as to these matters the bill was dismissed. In the case of Higginbottom vs. Powell, in which I considered the subject very fully, and in which the decree was affirmed by the Appeal Court at its last sitting. I held, that the Circuit Courts of the United States, were superior Courts of general jurisdiction, whose judgments, whatever error or irregularity they contain, must be respected by all other tribunals, until arrested or reversed by themselves. I do not think it necessary here to repeat the reasoning which led me to that conclusion. It is sufficient to refer to the opinion in that case. But, in truth, what error or irregularity appears on the present judgment? The bill, as amended, makes the allegation necessary to give jurisdiction — that the parties, plaintiff and defendant, are citizens of different States. Can I go into evidence to tty the truth of this allegation 1 And if I could, no such evidence has been offered, but rather the contrary. Or, is it supposed that I am to inquire and decide as to the regularity of the practice of the Supreme Court of the United States, by which, after having dismissed the bill for want of jurisdiction, it permitted the cause to be reinstated on the docket, and remanded to the Circuit Court for the purpose of being amended and heard ? and more especially when there is no doubt that this was done by tbe consent of the parties to the suit. By the practice of the English Chancery, it does not review its oxon decrees for error, apparent on the face of them, when they have been made by the consent of parties.
But the present complainant, Shultz, and all claiming in his right, must be estopped by the power of attorney to Walker and Fitzsimons, by which the sale was authorized. It is true that the power was executed under the order of the Court; but I do not know that the complainant was in custody, so as to give it the character of a deed obtained by duress of imprisonment, nor that the liability to be attached for failing to perform the order of the Court, could constitute such duress. Butin truth, the order of the Court was entered by consent. It was merely the initiative of a contract, which was afterwards carried into effect by the release and the final decree. Supposing it to be void as an order of the Court,it was still binding on the parties as matter of contract.
Then as to any right of the complainants in the bridge itself, it would be sufficient to say, that all the complainant, Shultz’s, right and interest therein, had passed away by the expiration of his charter. The franchise or exclusive privilege which constituted it his property, no longer exists, and the material structure is attached to and part of the soil, and would be the property of the States, the owners of that soil, if the francl'.ise had not been renewed to another. It was renewed to the defendant, the Bank, by both States, South Carolina and Georgia. It *468 is true, that there are eases in which the trustees of a franchise, obtaining a renewal of it in his own name to the prejudice of bis cestui que trusty has been held to continue a trustee. But I cannot perceive any plausible or even imaginable ground on which the Bank could be held a trustee in this case It claimed adversely under its mortgage, which was certainly good as against the parties to it. and all claiming under them, which the complainant, Shultz, must do if he claims at all. It was, so far as appears, for a bona fide debt. It was prosecuted as a hostile claim by the proceeding to foreclose it, in the Court of Georgia, and I think its validity established by the judgment of that Court.
The Act of the State of Georgia seems to relate only to assignments of tangible property, or choses in action, and not to the preferring of one creditor to another by payment of money I perceive nothing in the Act to authorize a proceeding for the reclaiming of the money in cise of such payment being made. So if the parties privately insolvent, should execute such mortgage, and before their absolute and avowed insolvency, should redeem the mortgage by paying the money, I perceive nothing to authorize the other creditors to pursue that money m the hands of the mortgagees. So if before any„proceeding by creditors to invalidate the mortgage, the mortgagee should foreclose by the jpdgment of a Court; if the mortgaged property should be sold, and the money paid over in pursuance of the judgment, there seems still less ground for supposing that creditors would be at liberty to follow the money. In this case the bridge was not actually sold under the judgment of the Court of Georgia; but this was only prevented bv the act of t.he present complainant, in obtaining the injunction from the Court of the United ¡Mates. The amount of their debt was awarded to the plaintiffs by the Court of Georgia, and the bridge ordered to be sold, and equity regards that as done which is ordered to be done. It is analagous to the case of a judgment, founded on a security which was void for usury, where t.he confessing or the entering of the judgment was not part of the original usurious contract, but it was obtained in adversum. Though the contract were absolutely void for the usury, yet when cairied into a judgment that judgment is valid against creditors of the insolvent usurious debtor, and against all the world.
Or, if it be said that the judgment of the Court of Georgia could only operate in rem as a foreclosure upon the half of the bridge lying within the State of Georgia, and could have no effect upon the moiety lying within the State of South Carolina, which is only subject to laws and tribunals of that Slate, then there is nothing in the laws of South Carolina to invalidate the mortgage of that portion of the bridge.
But so far as respects any right in the bridge itself, there are other conclusive grounds against complainant’s claim. The defendant, Gaza-way B. Lamar, purchased without notice of the claim of the assignee, or creditors of the complainant, Shultz, and purchasing from hirn, the City Council of Augusta would be protected as a purchaser from a .purchaser without notice. This was determined in the case of the *469 City Council of Charleston vs. Page, decided at tbe last sitting of tbe Court of Appeals. But as I have intimated, I do not think the notice to the City Council sufficient. If it was the notice of the claim of Shultz himself, and not of his assignee or creditors, knowing of his release of 1829, they would irresistibly be led to the conclusion, that he could have no claim whatever.
But, indeed, I think the whole claim of the bill is founded on a mis-' conception of the doctrine relative to the applying of partnership effects to partnership debts. It is said to be the equity of one partner to enforce such application, in order that his private property may not be made liable to partnership debts, until the partnership effects are exhausted. It is also said, that in cases of insolvency, this equity may be enforced at the instance of partnership ct editors, who, through this equity of the partners, obtain the benefit of such application. But this must be taken to relate to property in the hands of the partners at the time of total and acknowledged insolvency, and when there is some proceeding to wind up the affairs of the. insolvent firm. It cannot relate to property which the partners have before alienated, dona fide, as in payment of a just debt. Now, in this case, tho partners had alienated before the acknowledged insolvency. As I have said, .the mortgage was good and valid as against the partners themselves who executed it, and all claiming under them. As to the mortgage, it was dona fide, and it is immaterial that it was executed by tbe parties in their individual names. Such a method of execution, especially as regards real property, is usual and proper, if not necessary. Now suppose that Barna McKinne had remained a member of the firm ; had been sued on bridge bills, or other partnership debts, and compelled to pay them, is it to be supposed that he would be permitted to invalidate his own deed for the purpose of reimbursing himself? So if Shultz had not gone out of the firm, but had joined in the execution of the mortgage, and afterwards paid partnership d'-bts, as he has done, he would stand on the same footing. But I think this is his actual predicament. By resuming his place in the fi-m, and accepting a re-conveyance, he has put himself, to all intents and purposes, in tbe place of Barna Mc-Kiune, and must be estopped by whatever would estop McKinne He can only claim through him. He does not properly come as a partnership creditor, or the assignee of such creditor, to have a distribution of partnership assets, but as a partner who has joined in the alienation of partnership property, and then been compelled to pay partnership debts out of his own property. He was liable for the payment of those debts This view applies equally to any claim, legal or equitable, in the bridge itself, or the proceeds of its sale.
With respect to those proceeds, there are other grounds on which the claim must be held untenable, and among these is the objection to the jurisdiction of this Court, tak -n by the Bank of the State of Georgia. Having no interest, legal or equitable, in the bridge itself, they have no property within the St,ate. In the case of Bowden & Schatzel, Bail. *470 Eq. 360,it was determined that the resident of another State, having property within this State,might be made aparty in Court under our Actof the Legislature, though there were not any party within the State having possession or control of the property. But it has never occurred to any one to go further and say, that a party neither found or domiciled within the State, nor having property within it, might be made amenable to our jurisdiction. It was urged in argument, that by answering to the bill, the defendants have submitted to the jurisdiction, and must abide the decree on the merits. But it is a perfectly familiar practice, that a defendant may take advantage of that which would be properly the subject of a plea, by way of pleading in his answer. This the Bank has done. When it is said that the answer overrules a plea or demurrer, it is meant that the defendant must answer fully. The object of a formal plea is to excuse the defendant from answering. He is not to shield himself from making a full answer, on the ground of the excuse which he has offered in the answer itself. These defendants might properly answer for the purpose of showing the fact, that they had no property within the State, and were therefore not amenable to the jurisdiction. They might also properly answer, for the purpose of defending the title of their vendees. But is it not perfectly apparent, that any decree which I could make with respect to this fund would be perfectly nugatory ? If I should decree the payment of the money, what process could the complainant have for enforcing the decree? If I should order them to account, how could the Court enforce that order? If it were sought to enfirce such a decree in the Courts of Georgia, is it probable that those Courts would recognize the validity ol it?
On the ground of time in analogy to the statute of limitations. Whatever ground there may have been for regarding these defendants as mortgagees in possession, before the sale of 1822, and ihe fund produced by the sale as in custody of the Federal Court, they must certainly be regarded as claiming the fund adversely from the time of Shultz’s release of 1829, or at all events, from the decree of the Federal Court. This decree, in effect, awards the fund to them, and has relation back to the sale of 1822. But from the time of the decree in 1830, to the filing of the present bill in 1841, more than ten years have elapsed, and if it were necessary that the assignees of' Shultz should have notice of this adverse claim, they certainly had it so early as the hearing of the cause of Stoney anti Magrath in 1832. There are various other grounds which might be considered, leading to the same conclusion, and throwing insuperable difficulties in the way of’ the complainant’s success, but which I do not think it necessary to consider at length.
It does not appear that this fund, which was substituted for the bridge, was included in Shultz’s assignment of 1828. The assignment was of his interest in the bridge itself, and though the assignee of an insolvent debtor may be authorized, under the law of this State, to recover any property or interest which the insolvent has in the hands of any person *471 in the State, the law of South Carolina does not operate within the limits of Georgia. The assignment of a chose in action in another State, can only be made effectual as the personal act of the assignor. If this assignment were presented to a Court of Georgia, could the assignment of Shultz, of his interest in the bridge, be regarded as an assignment of money in the vaults of the Bank?
There was evidence of a previous assignment by Shultz, of all his interest in the bridge, to Gaston, of Savannah.
I could make no deeree concerning this fund, without a full account of all the transactions of the Bridge Company, which could only be done by having the representative of Barna McKinne a party, as well as John McKinne. It appears, indeed, that both these were largely indebted to the concern. It appears from the testimony of William Y. Hansel, the former cashier of the Bridge Bank, that these parties had withdrawn very large sums from the firm, for the use of themselves and other firms of which they were members; which, according to the testimony of the same witness, (and I can have no doubt of the fact,) occasioned the failure of the Bridge Company. But I could decide nothing on these .matters, without sueh full account as I have suggested. It appears that Shultz, at-the time he left the Company, was indebted to it in the sum of #63,000, for which credit was give» him on the books. But on his re-entering the firm, I suppose his indebtedness was reinstated for this amount. He is prima facie liable to the creditors of the Bridge Company ; indeed, he could not be discharged from his liability by the credit given, and this is a mueh larger amount, than the debt of the Company, which he has shown himself to have paid.
A question might be made with regard to the original invalidity of the mortgage The McKinnes were previously indebted to the Bank, in the sum of #40,000; they borrowed #50,000 at the time, which was represented to the Bank to helor the use of the Bridge Company, and I think must be regarded as the debt of the Company. Separate property, of John McKinne as well as the bridge, was included in the mortgage. It was stipulated, that upon tbe payment of #40,000, the the property of McKinne should be released, and upon the payment of the remaining #50,000 the bridge should he released. Now, whatever may be the general rule, with respect to a deed which is void in part, being void in the whole, it might well be questioned whether we should not regard these stipulations as creating separate mortgages for distinct debts, though included in the same instrument.
If, as I have supposed, the #50.000 were the debt of the Company, the defendant, Shultz, is liable Cor the whole of it, and would be compelled to bringit into account, if the account which be claims should be gone in.to.
But it is unnecessary to pursue these topics. The case has been an embarrassing one, from the great mass of Irrelevant matters, evidence, and documents, with which it has been incumbered, rather than from *472 any intrinsic difficulty with regard to the merits. I hope that an end will now be put to this long protracted litigation. The complainant is naturally disposed to think that he must have suffered injustice from having been deprived of property that was not only matter of interest, but of pride and feeling, and from having been harrassed and pursued on account of his responsibilities for a Company, to the failure of which he, as I am fully satisfied, did not at all contribute. But I believe he is inclined to shift the blame from those to whom it properly belongs, on account of some recollection of early kindness, and to throw it on others who have done nothing more than to stand upon what they fairly regarded as their just rights.
It is. ordered and decreed, that the bill be dismissed.
The plaintiffs appealed, on the following grounds :
1. Because the interest of Henry Shultz in the Augusta bridge has never bean legally disposed of¡ and is now subject, in the hands of his assignee, to the claims of his creditors.
2. Because the alleged mortgage of the bridge from John and Barna McKinne to the Bank of the State of Georgia, was null and void under the Act of the State of Georgia, referred to in the decree.
3. Because the bridge was the partnership property of the Bridge .Company, and the mortgage before referred to, to secure the individual debt of John and Barna McKinne. being void, it yet remains partnership property, and liable for the partnership debts ; and because the creditors of' Henry Shultz have the right to be subrogated to the equity of the partnership creditors, whose debts have been satisfied by the indi-vi lual property of the said Henry Shultz.
4. Because the alleged decree of the Circuit Court of the United States, at Savannah, in the case of Christian Breithaupt, Henry Shultz and others -Os. The Bank of the State of Georgia, is of no validity, so far as the present plaintiffs are concerned, the same having been rendered after the bill had been dismissed, and ¡ifter the interest of Henry Shultz, in the matters in controversy, had been assigned and transferred to his creditors.
5. Because the Bank of the State of Georgia, and the other defendants claim:ng under the said Bank, can derive no title to the bridge under the proceedings of the Superior Court of Richmond county, Georgia, as there never was a sale of the bridge under order of that Court; and especially is this so in reference to the South Carolina end of the said bridge
6. Because the defendants bought with full notice of the claims of the present plaintiffs
7. Because the Chancellor ought to have decreed that the bridge should be surrendered or sold, and that the parties account for the income.
8. Because the bridge, or at least one-half of it, being within the jurisdiction of the Court, and the defendants having answered, the *473 Court possessed ample jurisdiction of the cause, both with respect to the bridge itself and the proceeds. '
9.’ Because the Bank of the State of Georgia, in any view, should be required to account for the proceeds of the sale of the bridge, with interest.
10. Because, upon the pleadings and the proof, the plaintiffs were entitled to recover, and because the said decree is contrary to law and equity and the evidence.

Per Curiam.

The Court concurs generally in the views of the Chancellor, and the decree is affirmed.
Harper, Johnson and Dunkin, CC., concurring.